DOCKET NO. CV980332091S

* * * * * * * * * * * * * *X

    PATRICK NEMHARD      :  SUPERIOR COURT OF CONNECTICUT

        -VS-           :  JUDICIAL DISTRICT OF DANBURY

    WARDEN           :  APRIL 10, 2000

* * * * * * * * * * * * * *X


B E F O R E:

    THE HONORABLE ROBERT T. RESHA, JUDGE


A P P E A R A N C E S:

    VICKI HUTCHINSON, ESQUIRE
        240 Main Street
        Danbury, Connecticut  06810
    ATTORNEY FOR THE PETITIONER


    LINDA HOWE, ESQUIRE
        Assistant State's Attorney
        Division of Criminal Justice
        1061 Main Street
        Bridgeport, Connecticut  06604
    ATTORNEY FOR THE RESPONDENT


                                  Anne Marie Zschoche
                                       Court Monitor

```
 1              THE COURT:  Are the parties ready to
 2    proceed?
 3              MS. HUTCHINSON:  Yes, Your Honor.
 4              THE COURT:  Very well.
 5              If I can have counsel identify themselves
 6    please.
 7              MS. HUTCHINSON:  This is the matter of
 8    Patrick Nemhard versus Warden/State Prison.
 9              For the record, Vicki Hutchinson
10    representing the Petitioner, Patrick Nemhard.  He
11    is present in the Courtroom.
12              Your Honor, if I could have his  --  he's
13    shackled at the ankles.  If I could have his
14    handcuffs removed for this proceeding.
15              THE COURT:  That depends on the security
16    officers in attendance, if they feel comfortable
17    with the security, if he's not released.
18              I'm not concerned for the sake of his
19    having a fair hearing, as we don't have a jury to
20    impress, but I normally leave the court house
21    security to the sheriffs.
22              MS. HUTCHINSON:  Thank you.
23              (Whereupon, the sheriff removes the
24    petitioner's handcuffs.)
25              MS. HOWE:  Good morning, Your Honor.  My
26    name is Linda Howe, H-o-w-e.  I'm an Assistant
27    State's Attorney in the Judicial District of
```

1   Fairfield at Bridgeport, and I represent the
2   Respondent.
3           THE COURT:  Thank you, Counsel.
4           Attorney Hutchinson, are you ready to
5   proceed?
6           MS. HUTCHINSON:  Yes, Your Honor.  And
7   we'll be proceeding on the revised petition dated
8   February 2, 2000.
9           Your Honor, I do have transcripts to submit
10  as exhibits.
11          THE COURT:  Have they been reviewed with
12  counsel?
13          MS. HUTCHINSON:  Yes, Your Honor  --
14          THE COURT:  Any objection?
15          MS. HUTCHINSON:  (continuing)  --  I'll go
16  over them again.
17          MS. HOWE:  Yes.  Would you state for the
18  record what they are?
19          MS. HUTCHINSON:  Yes.
20          MS. HOWE:  Thank you.
21          MS. HUTCHINSON:  For the matter of State of
22  Connecticut versus Patrick Nemhard, docket number
23  CR93-083123S, in the Judicial District of
24  Fairfield at Bridgeport.  The first one that I'm
25  submitting contains the transcript for April 29,
26  1994 and May 2, 1994.
27          THE COURT:  April 29th and May 2nd of '94.

```
 1              And that is a transcript.  And you're
 2    offering that as a full exhibit?
 3              MS. HUTCHINSON:  Yes, Your Honor.
 4              THE COURT:  And there is no objection?
 5              MS. HOWE:  No objection, Your Honor.
 6              MS. HUTCHINSON:  Is that Exhibit One or A?
 7              THE CLERK:  One, Your Honor.
 8              THE COURT:  One will be fine.
 9              Petitioner's One.
10              MS. HUTCHINSON:  And the second one is for
11    the same case for the dates of May 3, 1994, May
12    4, 1994, May 5, 1994, May 6, 1994 and May 9,
13    1994.
14              THE COURT:  Petitioner's Number Two.
15              MS. HOWE:  No objection.
16              THE CLERK:  Yes, Your Honor.
17              THE COURT:  Are they all separate documents
18    or are they all included in one?
19              MS. HUTCHINSON:  They're all included in
20    one, Your Honor.
21              THE COURT:  Very well.  Thank you.
22              MS. HOWE:  Basically there's two bound
23    volumes for the Court.
24              THE COURT:  Very good.
25              MS. HUTCHINSON:  For my first witness I'll
26    call the Petitioner, Patrick Nemhard.
27              You can take the stand right up there.
```

```
 1              (Whereupon, the Witness takes the stand.)
 2              THE CLERK:  Please raise your right hand,
 3     sir.  Do you solemnly swear that the evidence you
 4     shall give concerning the case now in question,
 5     shall be the truth, the whole truth, and nothing
 6     but the truth, so help you God?
 7              MR. NEMHARD:  I do.
 8              THE CLERK:  Please state your name.
 9              MR. NEMHARD:  Patrick Nemhard.
10              THE CLERK:  Spell your last name.
11              MR. NEMHARD:  N-e-m-h-a-r-d.
12              THE CLERK:  And where are you staying now?
13              MR. NEMHARD:  I'm at the Garner
14     Correctional Institution.
15              MS. HUTCHINSON:  Good afternoon, Mr.
16     Nemhard.
17              MR. NEMHARD:  Good afternoon.
```

18 **DIRECT EXAMINATION BY ATTORNEY HUTCHINSON:**

```
19     Q    Are you a sentenced prisoner?
20     A    Yes, Ma'am.
21     Q    And how many sentences are serving right now?
22     A    I'm serving two.
23     Q    What's the first sentence?
24     A    Felony murder.
25     Q    And when were you convicted of that?
26     A    I think '93.
27     Q    And what is the second sentence?
```

```
 1      A    Rioting.

 2      Q    Rioting in any particular place?

 3      A    In a correctional institution.

 4      Q    What sentence did you receive on that charge?

 5      A    Twenty, suspended after fifteen.  Five years
 6   probation.

 7      Q    And is that concurrent or consecutive to the
 8   felony murder case?

 9      A    Concurrent.

10      Q    Concurrent?

11      A    Yes.

12      Q    Running at the same time or does it run
13   afterwards?

14      A    At the same time.  No, consecutive.

15      Q    So it's running after the felony murder one?

16      A    Yes.

17      Q    And are you serving those sentences now?

18      A    Yes, Ma'am.

19      Q    Okay.  And is the rioting in an institution
20   charge the one that's the subject of your habeas petition?

21      A    Yes, Ma'am.

22      Q    Do you recall when you were arrested on that
23   rioting charge?

24      A    I think it was January of '93.

25      Q    And where were you housed at that time?

26      A    In thirty-nine block.

27      Q    Okay.  In which prison?
```

1   A   Bridgeport.

2   Q   Were you awaiting trial on the felony murder
3   case?

4   A   Yes.

5   Q   And were you charged -- when you were arrested
6   in January of '93 were you charged just with rioting?

7   A   No ma'am.

8   Q   What were the other charges?

9   A   Okay, attempt to escape in the first degree,
10  assaulting a DOC, assaulting a correctional officer,
11  conspiracy, and rioting.

12  Q   Did you have an attorney representing you in
13  those cases, in those charges?

14  A   Yes.

15  Q   Okay.  And did you hire an attorney or did you
16  have a special --

17  A   State attorney.

18  Q   (Continuing) -- special public defender?

19  A   Yes.

20  Q   And what was the name of your attorney?

21  A   Dante Gallucci.  I think.

22  Q   Did you plead guilty on those charges?

23  A   No, Ma'am.

24  Q   Did you go to trial on those charges?

25  A   Yes, Ma'am.

26  Q   Before you went to trial on those charges, did
27  you meet with Mr. Gallucci?

1      A     Yes.

2      Q     And did you discuss with Mr. Gallucci the charges
3  against you?

4      A     Yes, Ma'am.

5      Q     Did Mr. Gallucci tell you what evidence the State
6  had to prove its cases, or its case, against you?

7      A     No.

8      Q     Did you specifically discuss with Mr. Gallucci
9  each of the charges?

10     A     Well I discussed the crime scene with him and let
11 him know what the COs did at the time when they came there.
12 And from what I know, a crime scene is suppose to be
13 blocked off.  The COs came and they did their own
14 investigation.  COs walked through, was looking around a
15 lot  --  they moved the evidence and things around.

16     Q     So would you have discussed that when you were
17 discussing the defenses to the case?

18     A     Yeah.

19     Q     But did you know what evidence the State was
20 going to present against you?

21     A     No, Ma'am.

22     Q     Did you have a defense that you were going to
23 assert at trial?

24     A     I just think that we went on  --  as the case
25 went along we just built a defense.  It wasn't like there
26 was a plan or this is the defense we're going to use.
27 Because I told him that what happened with me  --  that I

came out of the cell and my hand got caught in the door --

Q Okay.

A (Continuing) -- so we just like waited till the State talked and then we went along and built a defense on that.

Q Okay. Let me back up. You were charged with rioting in a prison --

A Yes, Ma'am.

Q (Continuing) -- is that correct? And attempted escape, is that correct?

A Yes.

Q And assault on a corrections officer?

A Yes, Ma'am.

Q And conspiracy to commit assault on a corrections officer?

A Yes, Ma'am.

Q Okay. And were you injured in the activities that took place in --

A Yes.

Q (Continuing) -- Bridgeport that date?

A I severed my left finger. I mean my left hand.

Q And how did you sever --

A My two middle index fingers.

Q Your middle index finger?

A Yes.

Q Did you cut it or was a piece removed?

A Like, the top of the flesh was torn off.

```
 1      Q    And was that part of your finger found somewhere?
 2      A    In the Day Room.
 3      Q    And that's the Day Room of the prison?
 4      A    Yes, Ma'am.
 5      Q    Did you discuss that evidence with Mr. Gallucci?
 6      A    I can't recall.
 7      Q    How did you injure your finger that day?
 8      A    In the cell door.
 9      Q    Specifically, how did you injure it?
10      A    Cell door jammed on it and I yanked it out.
11      Q    Do you remember which cell that was?
12      A    I think it was B  --  I think B-eleven.
13      Q    Might it have been A-ten?
14      A    Or A-ten.
15      Q    Have you been in a number of cells since that
16   time?
17      A    Yeah.
18      Q    Now, when you injured your finger in the door,
19   was there blood on the door?
20      A    Yes.
21      Q    Did you tell Mr. Gallucci about that?
22      A    Yes.
23      Q    Did you request that he do anything about that
24   blood evidence?
25      A    Well I told him that it was blood on the door,
26   because I cut my finger there, and could we get pictures or
27   a sample of that.  And then as far as he  --  I think, I
```

1  can't recall exactly, but I think he said that they most
2  likely gone and cleaned it up or, you know, it's not there.
3      Q   Did they find blood?  And when I say they, the
4  people investigating, did they find blood anywhere else in
5  the prison?
6      A   Yes.  They said  --  Lieutenant Patako testified
7  he saw blood stains in front of my door.
8      Q   Did you tell Attorney Gallucci about that?
9      A.  I can't recall.
10     Q   Did you request that Attorney Gallucci get
11 samples of these blood  --
12     A   Yeah.
13     Q   (Continuing)  --  stains?
14         And was there blood found anywhere else?
15     A   They're saying there was blood found in the Day
16 Room floor and blood on the window.
17     Q   Do you know if samples were taken of those blood
18 stains?
19     A   No.  It was proven, somewhat, that it was a red
20 fire extinguisher.  And it was proven that, somewhat that,
21 it came from the fire extinguisher on the door.  So they
22 never got  --  if they don't got blood samples of the day
23 they were found on, that wasn't blood on the door.
24     Q   Now, did your attorney advise you, before you
25 went to trial, of the likely result of going to trial?
26     A   Yes.
27     Q   Did he advise you what the likely-hood was of

1    success in defending these charges?
2        A    See, I know I told  --  I can't recall, I can't
3    recall what he said  --  I (inaudible).
4        Q    When you went to trial were you aware of what
5    would happen during the trial?
6        A    Yes.
7        Q    Were you aware of what evidence Attorney Gallucci
8    was going to present on your behalf?
9        A    No.
10       Q    You had not discussed that with him?
11       A    He didn't have no evidence.  The evidence that I
12   wanted wasn't there.  I wanted a blood sample, wanted
13   pictures of my blood being on the door at the time.  There
14   was none tooken.  All they presented was the State evidence
15   like the Day Room.  You know, I mean, because they were
16   saying there was an escape there.  So all their focus was
17   their investigation on the Day Room.
18       Q    So no physical evidence was presented for your
19   defense?
20       A    Yeah.  There was no physical evidence preserved
21   for my defense.
22       Q    On your petition you indicate that your
23   attorney's advise to you was incorrect.
24       A    Yes.
25       Q    What do you mean by that?
26            MS. HOWE:  Which paragraph are we referring
27            to, Counsel?

```
 1                    MS. HUTCHINSON:  Paragraph eleven.
 2                    MS. HOWE:  Thank you.
 3     BY MS. HUTCHINSON:
 4           A     What I'm saying  --  I was saying that  --  I
 5     can't recall.
 6           Q     Well let me withdraw it and go on to something
 7     else.
 8                 In your petition you state that your attorney
 9     failed to exclude prejudicial evidence which had not been
10     preserved.
11           A     Yes.
12           Q     What evidence is that?
13           A     The screen.
14           Q     Which screen in that?
15           A     They claim that I cut my hand on it.
16                 The fire extinguisher.  Patako testified he moved
17     it around, put it in the bubble.
18                 The crime scene, as far as my door, there was no
19     picture tooken.  There was no blood sample to prove that
20     the blood on the door was mine.
21                 And this is a prison, and there is fight break-
22     out, and there is blood sometime from another prisoner.
23     Been there for like a month, two or three months.
24           Q     And that evidence had not been preserved?
25           A     No.  Then none of the evidence was preserved.  I
26     mean, what I'm saying the preserved  --  the crime scene
27     evidence that was brought there was tampered with because
```

1   it was already moved around by COs.  And my door, as far as
2   the pictures, no pictures was tooken that day and no blood
3   samples tooken that day to prove that the blood on the door
4   was mines, and myself.  And that's what I said, I lost my
5   finger in my cell door.
6        Q    Despite the tampering, the evidence was still
7   submitted to the Court?
8        A    Still submit.
9        Q    And the evidence went to the jury?
10       A    Yes.
11       Q    Was there anything else you asked your attorney
12  to do for you in this trial that he failed to do?
13       A    I asked him to  --  is it possible that I can go
14  back and get the  --  what I wanted, I wanted the evidence
15  to be disclosed.  Really the evidence being the screen, the
16  fire extinguisher.  You know what I mean?  Because I told
17  him, before the evidence even came, I told him what the COs
18  did.  They came, they walked through, they touched these
19  things.  So I felt there should have been papers filed long
20  before, to block at least coming to trial.
21       Q    On the date that the incident in the prison took
22  place, about how many people were in the Day Room or the
23  area where this took place?
24       A    With staff?
25       Q    With staff.
26       A    There were no staff.  There was several
27  lieutenants and COs just come by and look, walk around.

1   COs motioned that one of their fellow officer's got hurt.
2   So a bunch of COs walking around -- they asked, Who do
3   it?
4           So I say, well at least before they took me to
5   the hospital, at least brought twelve or thirteen COs.
6       Q   Walking through the crime scene area?
7       A   Yes.
8       Q   While you were still there, before you were taken
9   to the hospital, was anything done to rope off or to block
10  off the area to preserve it?
11      A   No.
12      Q   And did you yourself see any of the evidence
13  being moved or changed?
14      A   I seen the fire extinguisher. They taken out the
15  fire extinguisher, the screen. They walk -- they just
16  walk and they took (inaudible) to the bubble.
17      Q   Did you see anybody walking through the blood
18  smears on the floor?
19      A   The COs.
20      Q   And you saw that?
21      A   Yeah.
22      Q   And you told your attorney that?
23      A   He knew that.
24      Q   The question really isn't did he know it.
25          Did you tell him that?
26      A   Yeah, I told him. He knew it. But I'm saying -
27  - what I'm discussing, I told him what they did as far as

1    the crime scene.  What they did, how they handled it.

2            Then the detective came like three or four hours

3    later.  And they claim, Well we do our own investigation.

4    When I tell him that these dudes don't have a license,

5    they're not prepared, they do not know how to do

6    investigations.

7        Q    When you say, These dudes, who are you referring

8    to?

9        A    The officer's the lieutenants, the majors.  You

10   know, the staff that runs the jail.

11       Q    That's the Department of Corrections, not the

12   Connecticut State Police?

13       A    Yes, Ma'am.

14       Q    Before you went to trial was there any motion in

15   limini or any motion to exclude this evidence filed?

16       A    I don't know.  We didn't discuss it.  I really

17   don't know.

18       Q    Were you in court when there was any type of

19   discussion about excluding this evidence?

20       A    Yes.

21       Q    Is that during the trial, or before the trial?

22       A    During the trial, when they presented it.

23       Q    While the jury was there?

24       A    I think so.

25       Q    Was there anything else that you had requested of

26   your attorney, with regard to these charges, that he failed

27   to do?

1   A    The main thing that I looked at was the evidence
2   being presented to the jury.  Because there's a photograph
3   where he tried stopping but  --  what I don't understand
4   was the night of the incident nobody took pictures.
5        But the day before the engineer testified, they
6   took pictures and brought it, of a door, and brought it
7   into the courtroom.  But I guess they claim that night it
8   wasn't important, but that day, to show the pictures to the
9   jury  --  and that was allowed in the courtroom.  So I felt
10  that tainted the jury's mind because it was  --  after it
11  was painted over.
12      Q    So this incident happened in January of '93.  Is
13  that correct?
14      A    Yes.
15      Q    And you went to trial around April, 1994?
16      A    Yes.
17      Q    And somebody came and took pictures  --
18      A    They day before, or two days, or the day before
19  the trial, and presented it to the jury.
20      Q    And that was some fourteen months after the
21  incident occurred?
22      A    Yeah.
23      Q    And was the scene, as depicted in the
24  photographs, the same as on the date of the incident?
25      A    No.  Because, see, they do not paint the jail
26  like, I don't know about now, but when I was there they do
27  not paint it on a regular basis.

1    What they would do, like -- what I wanted to
2 show was the sharpness of the door. Because if you have a
3 door hitting metal for so many months, it rubbed down. It
4 rubbed down, then the sharpness come back. And they do not
5 -- they claim they round the edge off. But my door was
6 not -- it wasn't my door they took. They took another
7 picture from another door. So this is how the door looked.
8 The jamb in the blocks.
9    So, that was seven months later and it was
10 painted over. You know what I mean? So it didn't show it
11 exactly, the definition, of the injury I could have got on
12 the door.
13    Q    So, painted over, did that mean that it was
14 rounded or that it was squared off?
15    A    I couldn't tell, it was painted over. But if you
16 took a picture of my door that night you would have seen
17 that.
18    Q    And did you ask your attorney to get pictures of
19 your door?
20    A    Yeah.
21    Q    And were pictures of your door, as it appeared in
22 January --
23    A    No. I asked him to get pictures of the blood
24 stain on my door.
25    Q    And that wasn't done?
26    A    No, that wasn't done.
27    Q    And just the door jamb itself, those pictures

```
 1   weren't done either, is that correct?
 2        A    No.  It was fourteen months later when the State
 3   knew that it  --  that they felt like they needed to show
 4   that a person couldn't lose their finger, or sever their
 5   finger, against metal, they went ahead and they took it.
 6        Q    Now the charge that you were convicted of,
 7   rioting, did your attorney go over the activities that were
 8   needed for rioting.
 9        A    No.  I didn't learn until after I got my appeal
10   about  --  I knew what rioting was and what it required
11   under a Connecticut statute in prison to say who's rioting.
12        Q    Okay.  And you didn't find out what those
13   elements were until after your trial, is that correct?
14        A    Yeah.
15        Q    So before your trial you never went over each of
16   the things cited in 53A-179B?
17        A    No.  I can't recall that.
18        Q    Have you filed any prior habeauses on this
19   matter?
20        A    I filed one to the Federal Court because I was
21   waiting for my appeal.  And I got an appeal from that, from
22   my attorney.  He said that he resolved all my remedies.
23   So, you know, I went to the feds.  So once I went to the
24   feds they told me  --  they kicked it back.  So that's when
25   I came here.
26        Q    Okay.  So you don't have any case pending in
27   Federal Court at this point?
```