1    A    No.

2    Q    And you filed no prior habeas' in the State

3    Court, is that correct?

4    A    No.

5    Q    And you did appeal your decision, is that

6    correct?

7    A    Yes.

8    Q    And the appeal was denied?

9    A    Yes.

10            MS. HUTCHINSON:  I have nothing further,

11   Your Honor.

12            THE COURT:  I just need one moment,

13   Counsel, before you cross.

14            (Whereupon, the Court takes a moment.)

15            THE COURT:  Attorney Howe.

16            MS. HOWE:  Thank you.

17            THE COURT:  You're welcome.

18   **CROSS EXAMINATION BY ATTORNEY HOWE:**

19   Q    Mr. Nemhard, you mentioned that your sentence was

20   twenty years, execution suspended after fifteen years,

21   consecutive.  Meaning after the sentence that you received

22   on the other matter.  And you said that the other matter

23   was a felony murder?

24   A    Yes, Ma'am.

25   Q    And is that that something you were convicted of?

26   A    Yes, Ma'am.

27   Q    So the twenty years after fifteen is consecutive

1   to the time you're doing on felony murder?

2   A   Yes.

3   Q   Okay. And you also have some other felony
4   convictions in your background as well.

5   A   Yes.

6   Q   Okay. Now, you indicated that Attorney Gallucci
7   was appointed to represent you after you were arrested and
8   your matter was brought to court?

9   A   Yes.

10  Q   So you're not claiming that Attorney Gallucci was
11  present at the time of the crime. He wasn't at the jail.

12  A   Oh, no, no, no, sure wasn't.

13  Q   So Attorney Gallucci was not physically present
14  at the time that you were in the jail for him to be
15  physically there to take photographs --

16  A   Oh, we know that.

17  Q   (Continuing) -- at the time of the situation?

18  A   Sure, Ma'am. No, he wasn't.

19  Q   All right. Now, would it be fair to say that the
20  gist -- well we have the transcripts from your trial that
21  are introduced as exhibits in this matter, but would it be
22  fair to say that the gist of the situation on January --
23  let's see, what was the date here -- January the
24  sixteenth of 1993, was that a situation that occurred at
25  the Bridgeport Jail, that's the North Avenue jail in the
26  City of Bridgeport?

27  A   Yes, Ma'am.

1    Q    And in that situation there was a corrections
2    officer who operated out of what's called the bubble, which
3    is the control center, and from that bubble you can look
4    down the corridors where the various cells are. Correct?
5    A    Yes.
6    Q    And the corrections officer, his attention was
7    drawn out of the -- came out of the bubble because some
8    inmates, who were working on like a clean-up detail, called
9    him aside and somebody hit the corrections officer, knocked
10   him unconscious, he was dragged into a cell, beaten up.
11       Another inmate went into the bubble and started
12   opening the cells so prisoners could get out.
13   A    No they didn't knock him out.
14   Q    I'm not saying -- I'm just saying that's the
15   general nature of the case for starters --
16   A    Yes.
17   Q    (Continuing) -- that's what started this.
18       And a variety of inmates came out --
19   A    The whole block, the whole block.
20   Q    Okay. Well, right. That would happen if the
21   doors were open and people could get out.
22   A    Right. Everybody comes out.
23   Q    Okay. And that there's -- the cell that you
24   were in at the time was cell --
25   A    B-ten.
26   Q    Pardon me?
27   A    I think B-ten.

1   Q   Well you were in cell number ten. A-ten. Okay.
2       And that your -- a part of your finger was
3       found in the A-ten Day Room.
4   A   Yes.
5   Q   And your cell is in one part of the corridor, and
6   the Day Room, where your finger tip was found, is down the
7   hall and around the corner and inside another room.
8   A   No. It's not down the hall, it's right next --
9   Q   I'll withdraw it.
10  A   This is my block and the Day Room is right here.
11  So I'm like a cell over.
12  (Whereupon, the petitioner illustrates where his cell was
13  located.)
14  Q   But the place where your finger was found, finger
15  tip was found, was not in your cell.
16  A   No.
17  Q   During the course of your trial there was a
18  diagram that showed the layout of the corridors in the
19  jail. Where the bubble was, where your cell was, and where
20  the Day Room was.
21  A   Yes, Ma'am.
22  Q   That was introduced as an exhibit.
23      And there was testimony about where your cell
24  was, and where you were, and where the finger tip was
25  found. Correct?
26  A   Yes, Ma'am.
27  Q   There was also testimony that, from another

1  inmate, that he had seen you outside of your cell.
2  A   Yes, yes, yes, yes, yes --
3  Q   I'm not asking do you agree with it, that was
4  testimony --
5  A   (Continuing) -- yeah.
6  Q   (Continuing) -- right?
7      And there was testimony from corrections persons
8  that you were outside of your cell.
9  A   Yes.
10 Q   There was testimony that your finger tip was
11 found basically in the area where a metal screen had been
12 pulled down from a window.  And apparently someone had
13 tried to break open the window, because there were marks on
14 the window from some objects hitting the window, and that's
15 the area where your fingertip was found.
16     That was the gist of the case?
17 A   It was found in several different -- it was
18 claimed to --
19 Q   Well, I'm just asking you, is that the gist of
20 the evidence?  Not whether you agree with it, but that's
21 the gist of the evidence against you?
22 A   Oh.  No, it's not.  It was found in several
23 different areas, by several different -- it was testified
24 one found here, one found here, one found here.
25 Q   But it's all in the Day Room?
26 A   Yeah.
27 Q   And in that general area where the window --

1  A Yeah.

2  Q (Continuing) -- and the screen that was pulled
3 back from that window, is a metal screen --

4  A Yes.

5  Q (Continuing) -- with sharp edges to it?

6  A Yep.

7  Q Okay. And the State's theory of the case was
8 that you hurt your finger -- your finger was severed in
9 the process of trying to pull this sharp metal screen out.

10  A Yes.

11  Q And that's how your finger tip got there?

12  A That's what they said.

13  Q Which would make you a person, for your finger
14 tip to get there, and be removed from your finger, you
15 would have had to have been in that Day Room for your
16 finger tip to get there. That's the State's theory of the
17 case?

18  A Yeah.

19  Q And your theory of the case was that, No, my
20 finger tip was -- I lost my finger tip because I caught
21 my finger in the cell door as it was closing.

22  A Yes.

23  Q That was your theory?

24  A Yes.

25  Q And your theory was presented to the jury,
26 correct?

27  A Yes.

1  Q   The State's theory was presented to the jury?
2  A   Yes.
3  Q   Okay. And witnesses testified about where your
4  finger tip was found.
5  A   Yes.
6  Q   And you presented your version of the case to the
7  jury also.
8  A   Yes.
9  Q   The jury basically made up their mind as to
10 whether or not they found -- whose evidence they found
11 more believable?
12 A   Tainted evidence, (inaudible).
13 Q   Well, I'm just asking. That was basically how
14 the trial went?
15 A   Yes.
16 Q   Now your attorney, Attorney Gallucci, you
17 indicated that he was appointed to represent you, correct?
18 A   Yes.
19 Q   When you were originally brought to court, you
20 were facing charges of being one of the parties involved in
21 assaulting that officer, the corrections officer?
22 A   Yep.
23 Q   That corrections officer was very badly hurt,
24 wasn't he?
25 A   Yes, he was.
26 Q   You were also charged with attempting to escape.
27 A   Yes, I was.

1    Q    You were charged with rioting at the correctional
2  institution.
3    A    Yes I was.
4    Q    And you were charged with conspiracy to commit
5  the assault on the officer, the corrections officer, who
6  was assaulted.
7    A    The conspiracy covered everything.
8    Q    Okay. And in terms of going to trial, your
9  attorney, Attorney Gallucci, was successful in getting you
10  --  after the State closed it's evidence, your attorney
11  argued, and the Judge believed, that you were not  --
12  there wasn't enough evidence to proceed with the assault
13  charges. Those were dropped  --
14    A    That's right.
15    Q    (Continuing)  --  correct?
16        And the jury heard the rest of the case. The
17  attempted escape and the rioting. And your attorney
18  managed to get you acquitted on the attempted escape.
19    A    Yes, Ma'am.
20    Q    But you were convicted on the rioting?
21    A    Yes, Ma'am.
22    Q    y. So in terms of the charges that you
23  originally faced, you were successful on all of those
24  charges except the rioting charge?
25    A    Yes.
26    Q    Now, during the course of your  --  you mention
27  that the claims you're making  --  well the business about

1    your hand being caught in the door, that was something that
2    you told to the people in the Department of Corrections
3    right at the time of this incident. Isn't that correct?
4         A    Yes.
5         Q    One of the reasons you told that to them is
6    because when your finger was cut, it was bleeding, correct?
7         A    It was bleeding.
8         Q    And you needed medical attention for that?
9         A    Yes.
10        Q    So the fact that your finger was bleeding was
11   something you brought to the attention of the correction
12   officers on January the sixteenth?
13        A    Cause I was injured, yes.
14        Q    You were injured?
15        A    Yeah.
16        Q    And you gave them the story that you caught your
17   finger in the cell door on that evening?
18        A    Yeah, when I came out.
19        Q    Okay. So that was the defense that you were
20   making, basically, from the beginning of the case?
21        A    Yes.
22        Q    Your attorney was aware that, that was your
23   claim?
24        A    Yes.
25        Q    So when you say about developing a defense, that
26   was your defense, I hurt my finger in the cell door?
27        A    Yes.

1  Q   You were aware at least -- you were aware,
2  pretty soon into the case, and your attorney was aware,
3  that there was evidence that your finger tip was found not
4  in your cell but in the Day Room where the window had been
5  attempted to be pried open?
6  A   Yeah.
7  Q   So both of those items, the evidence, your claim,
8  and the fact that your finger tip was not found in your
9  cell but was found in the Day Room, that's something that
10 your attorney was aware of.  You know, once he was
11 appointed to represent you, correct?
12 A   Yeah.
13 Q   The finger tip was --
14 A   Yeah.
15 Q   (Continuing)  -- the finger tip was found right
16 then and there, correct?
17 A   Yes.
18 Q   It was found that day.  And the state trooper who
19 -- the detective who investigated the case, he took a
20 photograph of where the finger tip --
21 A   Yes, he did.
22 Q   (Continuing) -- and that was introduced at your
23 trial?
24 A   Yes, he did.
25 Q   Now in terms of investigating this case, Attorney
26 Gallucci was not appointed to represent you.  You said, He
27 wasn't there when the riot occurred, correct?

```
 1              Correct?
 2       A      Yes.
 3       Q      Attorney Gallucci was not appointed to represent
 4  you within a matter of hours after the riot occurred.
 5       A      No, he wasn't.
 6       Q      About how long, to your recollection, was it
 7  before Attorney Gallucci was appointed to represent you?
 8       A      Can't remember.
 9       Q      Well, would you say it was a couple of weeks, a
10  month perhaps?
11       A      I speculate it probably a couple of weeks.
12       Q      Because when you were  --  after you were
13  arrested, you had to go the geographical area court,
14  correct?
15       A      Yes.
16       Q      Then your case got transferred to the Part-A
17  Court?
18       A      No, we didn't do all that.
19              As far as I know, when I came, I went to Somers.
20  From Somers we came down there and he was appointed
21  attorney.
22       Q      Oh, okay.  But Attorney Gallucci was not
23  appointed to represent you like right the day after the
24  incident?
25       A      Of course not.
26       Q      And Attorney Gallucci was not there when the
27  evidence was collected, was he?
```

1  A No, he wasn't.

2  Q So you're not claiming that Attorney Gallucci had any capability of taking photographs at the time of the incident?

5  A No.

6  Q So basically what you're claiming about Attorney Gallucci, is you felt that he should have brought to the jury's attention the fact that photographs were not taken of your door, the door to your cell, the way you would have liked photographs to have been taken?

11  A (Inaudible) isn't what I would have liked. It's just not right. It's not what I would have liked.

13  Q So you're not basically saying Attorney Gallucci should have taken photos, you're saying the trooper or, excuse me, the detective should have taken pictures.

16  A I'm saying there should have been a thorough investigation.

18  Q All right. I just want to make it clear.

You're not claiming Attorney Gallucci should have been there to take the pictures. You're saying the people who investigated the case should have taken the pictures.

22  A That's right.

23  Q Okay. All right. That's what I'm getting.

And you're also saying that -- well in this particular situation there are a lot of people who are out of their cells, correct?

27  A A lot.

```
 1       Q    There was an officer who was severely injured and
 2  thrown in a jail cell, correct?
 3       A    Yes.
 4       Q    And when this -- after this happened the people
 5  in the Department of Corrections had to restore order to
 6  the scene.
 7       A    Order was already restored when they came.
 8       Q    Well, people had to go back into their cells,
 9  corrections officers had to investigate this.
10       A    Well, when they came back to the block, everybody
11  was in their cell.  They may have found one or two dudes in
12  another area, but the block was mainly secured when they
13  came back.
14       Q    Are you claiming that you think the Department of
15  Corrections has no authority to investigate the behavior of
16  the people who are in the Department of Corrections as
17  inmates?
18       A    No, I'm not saying that.
19       Q    Now, during the course of your trial, the
20  detective or corrections officers testified, correct?
21       A    Yes.
22       Q    And they testified as to their observations,
23  correct?
24  (Whereupon, the Petitioner shook his head.)
25            Is that a yes?
26       A    Yes.
27       Q    Okay.  And the detective, from the Connecticut
```

1  State Police, who investigated the case, he testified also?

2      A    Yes.

3      Q    Your attorney had the opportunity, and he did in
4  fact, question these people as to what they observed and
5  when they observed it, correct?

6      A    Yes.

7      Q    As far as the photographing of your door, what
8  parts of the door were photographed, if any, and what the
9  trooper, the detective observed, that was testified to?

10     A    Yes.

11     Q    Your attorney, in fact, brought out at the course
12 of your trial that the detective hadn't taken a photograph
13 of the door and the door jamb.

14     A    I can't  --

15     Q    Didn't that come out during trial?
16         The detective was asked, Did you take a
17 photograph of the door and the door jamb?

18     A    (Continuing)  --  I can't recall. Can you look
19 it up?

20     Q    Okay, well, that's fine. Fair enough. The Judge
21 has the transcript.
22         The detective also testified as to what he saw in
23 your cell door.

24     A    Yes.

25     Q    The corrections officers who were involved, they
26 testified as to what they saw.

27     A    Yes.

```
 1        Q    Now, in terms of the photographs of your cell
 2   door that were eventually admitted at trial  --
 3        A    Not my cell door.
 4        Q    (Continuing)  --  or, of cell doors  --
 5        A    Yeah.
 6        Q    (Continuing)  --  what you're complaining about
 7   is that during the course of your trial the State produced
 8   somebody from the maintenance section of Bridgeport jail.
 9   And this man, from the maintenance section, testified about
10   how the cell doors open and close, correct?
11   (Whereupon, the Petitioner shook his head.)
12             Is that a yes?
13        A    Yes.
14        Q    There were some photographs introduced which
15   showed how a cell door looks, and the edges, what the door
16   jamb looks, and what the door looks like.
17        A    Yes.
18        Q    During the course of presentation of this
19   evidence, it was made known to the jury that these were not
20   photographs taken at the time of the riot, but they were
21   photographs taken simply to show what the door looks like
22   and what the door jamb looks like.
23        A    Yes, Ma'am.
24        Q    So the jury knew that those photos were not
25   photos of your cell door from the night of the riot  --
26   the day of the riot?
27        A    I can't say.
```

1   Q   Well, the transcript will speak for itself.
2       And your attorney brought to the attention of the
3   jury that those photos were taken after the time of the
4   crime.
5   A   Yes.
6   Q   So your attorney dealt with that factor. He
7   brought that factor to the jury's attention.
8   A   Yes.
9   Q   He objected to it?
10  A   Yes, he did.
11  Q   The Judge overruled his objection and it came in
12  anyway, correct?
13  A   Yes.
14  Q   Now, you said you asked your attorney to get a
15  picture of the blood stain on your door, correct?
16  A   Yes.
17  Q   For your attorney to get that photograph, he
18  would have to get it from the detective who investigated
19  the case, correct?
20  A   Yes.
21  Q   And if the detective didn't take that picture
22  your attorney couldn't get it because it wasn't taken.
23  A   Yes.
24  Q   So the best your attorney could do, would be to
25  bring to the jury's attention that the detective didn't
26  take that picture.
27  A   Well I really wanted a photograph of my door to

1   show that.  Because they were saying that doors are rounded
2   off.  But my door was not round, it was flat.  So I wanted
3   to show the definition of my door.  Specifically, my door.
4   That it is sharp like this right here.
5   (Whereupon, the Witness shows example of sharp edge.)
6              They were saying it was rounded off.
7              That's what I really wanted to show too.
8       Q    You're claiming that the doors had been painted
9   by the time this --
10      A    Yes.
11      Q    Okay.  And you testified about your door?
12      A    Yes.
13      Q    You're saying that your attorney did not explain
14  the elements or what rioting is to you?
15      A    No.
16      Q    Now, there was a claim that you made, concerning
17  that your attorney's advice to you whether to proceed to
18  trial, was incomplete?
19      A    Repeat that again please.
20      Q    What is your claim about your decision whether
21  you should go to trial?  Did you ever consider entering a
22  plea to any of these charges?
23      A    No --
24      Q    No?
25      A    (Continuing)  --  cause I was innocent.
26      Q    Pardon me?
27      A    I didn't do it.  No.

1    Q    So your answer is, No?

2    A    No.

3    Q    So in terms of the decision whether to go to
4    trial or to enter a plea to all or any of the charges, that
5    was your choice?

6    A    Yes.

7    Q    Your attorney, Attorney Gallucci, he discussed
8    with you the options of going to trial or entering a plea?

9         I mean basically you kind of have two choices,
10   you either go to trial or enter  --

11   A    I was given a choice for five years by the State.
12        I turned it down.

13   Q    Okay.  That's what I'm getting at.

14        You were made an offer, you knew what the offer
15   was, you didn't take the offer.

16   A    No.

17   Q    That choice was explained to you, by Attorney
18   Gallucci, and you said you don't want it.  You want to go
19   to trial?

20   A    Yeah.

21   Q    Before you went to trial, you were aware that
22   your claim was that your finger was severed on your cell
23   door  --

24   A    My cell door.

25   Q    (Continuing)  --  And you were aware that the
26   State's claim was that your finger was severed in the Day
27   Room, by the window, with the sharp screen that was pulled

1  back?

2  A   No. All I know is that my finger was in the Day
3  Room. I didn't know what the defense was.

4  Q   You knew that your finger was found in the Day
5  Room?

6  A   Yes.

7  Q   You knew that, that difference in evidence,
8  between your claim and the State's claim, you knew that was
9  going to come out in front of the jury?

10  A   Sure.

11  Q   So that's not some secret that was kept from you.
12  Your attorney and you discussed this.

13  A   We didn't know the evidence. We didn't know what
14  they was going to claim. How I lost my finger.

15  Q   But you knew where it was found?

16  A   Yes.

17  Q   You knew that the screen on that window was a
18  metal screen. And you've been in that Day Room  --

19  A   Yeah, I've been in that Day Room.

20  Q   (Continuing) -- before. Sure. You knew there
21  was a metal screen and it had sharp edges to it, correct?

22  A   But I did not know they -- they bought the fire
23  extinguisher and the screen, but I didn't know they was
24  going to say I lost my fingers while I was hitting --
25  first they said I was hitting the door, then they said I
26  was pulling it, so I didn't know what they was going to
27  use.