1      A      I was also self employed with the firm of DeSiena

2    and Gallucci.  At that time we were located at Two-thirty-

3    nine Golden Hill in Bridgeport.

4      Q      And did you also do work for the State of

5    Connecticut as a Special Public Defender?

6      A      Yes, I did.

7      Q      And at some point, early in 1993, were you

8    appointed to represent Mr. Nemhard as a Special Public

9    Defender?

10      A      Yes, I believe was.  Yes, in 1993.

11      Q      And on what charges were you appointed to

12    represent him?

13      A      These were charges emanating out of an alleged

14    riot that took place at the correctional facility.  I

15    believe it was rioting, assault, attempted escape and

16    conspiracy.  I probably have to look at my notes to see if

17    there are any other charges.

18             I think it was assault on a corrections officer.

19      Assault first, assault of a corrections officer, rioting

20    in a correctional institution, attempted escape, and

21    conspiracy.

22      Q      Were you appointed out of part B or part A?

23      A      Part A.

24      Q      Do you know who represented him in part B?

25      A      I do not know.

26      Q      Do your notes reflect when your representation

27    commenced?

1     A     Actually, I was looking at this right before I

2     got up here, and I believe it was late March, of 1993.

3     Approximately  --  a little more than two months after the

4     incident.

5     Q     When you were appointed to represent Mr. Nemhard,

6     did you meet with him?

7     A     I'm not sure exactly when we met at first.  I

8     sent him a letter March 22, 1993, telling him I had been

9     appointed.  And I'm not sure  --  I don't recall the first

10    time we met.  I just don't have  --  I've been searching my

11    mind, but I just don't have a recollection of that.

12    Q     At some point did you become aware that Mr.

13    Nemhard had lost part of his finger in this incident?

14    A     Yes, I did.

15    Q     Did Mr. Nemhard tell you how he had lost his

16    finger?

17    A     Yes, he did.

18    Q     And did he tell you, or did he describe to you,

19    what the door was like on his cell block?

20    A     Did he tell me what the door was like?  Yes, he

21    did.

22    Q     Did he describe it as having a squared-off or

23    sharp edge?

24    A     I recall discussing it with him, the idea that it

25    was a sharp edge, and I know that he had said that.  I

26    can't tell you exactly when he first said that, but I know

27    he said it.

1     Q     Was that before trial commenced?

2     A     Yes.

3     Q     Did you take any steps to have photographs taken

4  of that door with the sharp edge?

5     A     No, I did not.

6     Q     Did you make any motions to have the State have

7  photographs taken of that door since the incident took

8  place in a state controlled facility?

9     A     No, I did not.

10     Q     Did you contact the investigating officers to see

11  if anybody else had taken photographs of that particular

12  door?

13     A     Well, I was aware of the fact that nobody else

14  had taken photographs of the door.

15     Q     Were you aware that there was some blood on the

16  door of Mr. Nemhard's cell?

17     A     At what time, when?  I'm not sure of the time

18  frame.

19     Q     Did you become aware, during your investigation,

20  that on the date of the incident there  --

21     A     Yes.

22     Q     (Continuing)  --  was blood?

23     A     Yes.

24     Q     And did you ascertain that there were no

25  photographs taken of that blood?

26     A     I learned at some point that they had not

27  photographed any blood by his cell door.

1    Q    And did you discuss that with the investigating

2  officers at all?

3    A    Not with the investigating officers.  I did

4  discuss it with the State's Attorney at one point.

5    Q    At some point you filed a motion in limine, is

6  that correct?

7    A    Yes  --  I don't recall, it was seven years ago.

8  I may have.  I'm not sure if I did or not.  I could look

9  through my notes and see if I have a copy of it, but I

10  can't recall as I'm sitting here whether I did.

11    Q    Well if the docket sheets were to reflect that a

12  motion in limine and a motion to suppress were filed and

13  put over to the time of trial, would that refresh your

14  recollection?

15    A    Well, I would have no reason to dispute that.  If

16  I could have a second  --  if you'll let me look, I might

17  have a copy.

18  (Whereupon, the witness takes a moment to look through his

19  papers.)

20    A    (Continuing)  --  I see that on April 5, 1993, a

21  pro forma motion to suppress was filed.  It appears that a

22  series of pretrial motions were filed on that date.

23    There was a motion in limine, it went to prior

24  convictions on that date.

25    Q    Do you recall if you filed any motion in limine

26  to exclude  --  let me withdraw that.

27    Do you recall Mr. Nemhard telling you that there

1    were many individuals moving about the crime scene before

2    it was secured?

3         A    I recall us discussing the fact that there were a

4    lot of individuals in the block area at that time.  I don't

5    know about the crime scene.

6         Q    And this incident occurred in the block area, is

7    that correct?

8         A    The incident occurred in about three different

9    areas.  One occurred in the hall way, one was in the  --

10   one allegation was in the Day Room, and the third, well,

11   the third allegation, by the defendant, was that part of it

12   took place in his cell.

13        Q    Didn't Mr. Nemhard tell you that a lot of people

14   had been moving around, and evidence had been moved or

15   tampered with?

16        A    I don't know that he told me that.  He had told

17   me that in order for his finger to have been found, where

18   they claim to have been found, that it would of have had to

19   have been moved .

20        Q    And did you make any motions in limine to

21   preclude evidence that had been moved or tampered with from

22   being introduced at the time of trial?

23        A    No.

24        Q    Did you make any motions to suppress evidence

25   that had been moved or tampered with?

26        A    No.  I had no evidence that it had been tampered

27   with.

1    Q    Mr. Nemhard had told you other officers had been

2    through there, touching things, moving things  --

3    A    Well, I don't know that Mr. Nemhard had any

4    knowledge whatsoever of what had happened in the Day Room.

5          According to Mr. Nemhard's version of what

6    happened, he was, at that point, in his cell.  So I don't

7    know that it's correct that he told me that specifically,

8    or that was a theory that he had.

9    Q    If it was a theory that he had, did you do

10   anything to follow up on it?

11   A    He had more than one theory on the case, but what

12   we did was we  --  our whole theory of defense in the case

13   was based on the theory that he wanted to put forth at the

14   time of trial.

15   Q    And that was that his finger was injured in the

16   door jamb?

17   A    That's the theory that he wanted to put forth at

18   trial.

19   Q    Is that the theory that, in fact, you did put

20   forth at trial?

21   A    Yes.

22   Q    That his finger was crushed in the door jamb

23   rather than being sliced on a sharp window?

24   A    Well, I don't recall that exactly.

25          I don't recall that.

26          I know that his  --  what he wanted to claim at

27   trial was that he had injured his finger in the door jamb

1    of his own cell.  I don't remember sliced or crushed.

2         Q    Did he ask you to do anything specific so that

3    theory could be presented?

4         A    He was very concerned about several inmates being

5    called to testify as to his whereabouts and his activities

6    during the time.  He also wanted to make sure that somebody

7    from the State admitted that blood was found near his cell

8    door.  And I think those two things were accomplished.

9         Q    But that blood had never been photographed or

10   tested, is that correct?

11        A    No, not to my knowledge.

12             MS. HUTCHINSON:  If I could just have a

13             moment.

14             THE COURT:  Certainly.

15   BY MS. HUTCHINSON:

16        Q    Do you recall Lieutenant Phillip Patako, from the

17   Department of Corrections, testifying during the trial?

18        A    I don't recall his testimony as I'm sitting here,

19   but I recall the name.  And I do believe he testified at

20   the trial.

21        Q    Okay.  And do you recall asking him whether he

22   had moved evidence around so that he could (inaudible) the

23   other inmates?

24        A    I don't recall that.

25             I just don't remember specifically asking who I

26   asked that  --  there were questions about removing the

27   finger from the crime scene, I remember that.  And I

1    remember asking people from Corrections that, but I'm not

2    sure of that individual.

3        Q    But you do recall questioning witnesses about

4    that?

5        A    Yes.

6        Q    And that information you would have gotten from

7    your client, is that correct?

8        A    No.  It was also based on inconsistencies in

9    their direct testimony as to where it was located.

10       Q    In other words, one witness said it was in one

11   place, another witness said it was ten feet away?

12       A    There was definitely a variance between some of

13   the testimony, in the testimony, about where the finger was

14   recovered.

15       Q    What about the other physical evidence, the fire

16   extinguisher?  Do you recall there being testimony about

17   that having been moved by corrections officers?

18       A    I don't recall as I'm sitting here now, no.

19            I know there is a fire extinguisher involved and

20   I know that it was described.  I remember that.  I don't

21   remember whether they talked about moving it.  They could

22   have, but I just don't remember.

23       Q    That would be in the transcripts though?

24       A    I assume it would be, yeah.

25            MS. HUTCHINSON:  Nothing further, Your

26            Honor.

27            THE COURT:  Thank you.

1        Attorney Howe?

2            MS. HOWE:  Thank you.

3            I'd like to introduce, as exhibits,

4        photocopies of the Appellate Court.

5            A direct appeal was taken in this case and

6        I would like to offer as exhibits the Appellate

7        Court record, and the brief of the Appellant, and

8        brief of the State of Connecticut.

9    **CROSS EXAMINATION BY MS. HOWE:**

10       Q    I would inquire, Attorney Gallucci, you were the

11   person who did the direct appeal on this matter, were you

12   not?

13       A    Yes, I did.

14            MS. HUTCHINSON:  Your Honor, I've seen the

15        two briefs and the record.  I have no objection.

16        Just indicate which is being marked as which.

17            THE COURT:  Very well.

18            THE CLERK:  A, should be the Record.  We'll

19        look at the Record first.  Record is Exhibit A.

20            THE COURT:  That would be State's A?

21            THE CLERK:  Yes.

22            Then the Appellant's Brief is B, Your

23        Honor.

24            THE COURT:  State's B.

25            THE CLERK:  Then the State's Brief is C.

26            THE COURT:  State C.

27            THE CLERK:  This is the Warden's A, B, and

1       C reports as exhibits.

2              THE COURT:  Very well.  They may be made

3       full exhibits as there is no objection.

4              (Whereupon, the documents were marked as

5       State's A, B and C for identification.)

6              MS. HOWE:  May I voir dire the witness

7       please?

8              THE COURT:  Yes.

9    **VOIR DIRE BY MS. HOWE:**

10       Q    Attorney Gallucci, could you explain in a bit

11   more detail your experience in the area of criminal law

12   please.

13       A    I became an attorney in November of 1983.  I

14   served as a per diem Public Defender in Norwalk for several

15   months.

16              Between 1983 and 1984 I was an Assistant Attorney

17   General for the State which basically  --  part of my job

18   was prosecuting welfare fraud type cases.

19              From 1984 till the end of 1985, when I returned

20   to private practice, I started doing special public

21   defender work as well as private work, and probably  --  as

22   of now I've handled over two thousand cases.  I've done

23   sixty-three felony trials to a conclusion, including

24   fourteen murders.  I've handled somewhere between eighteen

25   and twenty appeals in both a Supreme and Appellate Court.

26   In 1993, I would say it was probably, maybe, a little more

27   than half of that in terms of total cases.

1    Q    And in the course of your representing criminal

2    defendants, you have had other cases that involved the

3    charges in particular, have you not?

4    A    Yes, I have.  In fact approximately a year or two

5    before this trial I had a pretty infamous, pretty well

6    known, high publicized riot case that I was involved in, in

7    a trial.

8    Q    So you were familiar with the elements of the

9    crime of rioting?

10    A    Oh, painfully familiar.

11    Q    And you're familiar with basically the types of

12    evidence that a defense might stress in a rioting case.

13    For example, understandably, that rioting involves a

14    multitude of parties, and perhaps you could benefit by

15    attempting to show some confusion to the court presenting a

16    defense.  Would that be a general tactic that one might

17    utilize?  --

18    A    I don't know.

19    Q    (Continuing)  --  Or inconsistencies between

20    various recollections of an event?

21    A    That would be true in any criminal defense.

22    Q    Okay.  In the course of defending Mr. Nemhard,

23    you did your best to point out inconsistencies between one

24    person's recollection and another person's recollection.

25    A    Right.  There were several inconsistencies,

26    particularly about the recovery of the finger.  I recall

27    that pretty strongly.

1    Q    That was presented to the jury, was it not?

2    A    I believe so, yeah.

3    Q    When you talk about inconsistencies, would it be

4    fair to say, however, that all of the witnesses who

5    testified about the recovery of Mr. Nemhard's finger, or

6    finger tip, all of the parties placed it in the A-ten Day

7    Room?

8    A    Yes.  They all did, except for Mr. Nemhard.  But

9    yes, they did.  --

10    Q    Okay.  Except  --  well Mr. Nemhard  --

11    A    (Continuing)  --  Different locations in the same

12    Day Room, yes.

13    Q    (Continuing)  --  Okay.  So we're not talking

14    about some people placing it in one part of the

15    correctional facility, another  --  they all placed it in

16    the same room.  It's just how many feet from the screen and

17    the door, you know, the particular location on the floor

18    that there was a discrepancy.

19    A    Yeah.  There was more than one discrepancy about

20    the location of it on the floor in the Day Room.

21    Q    But they all put it in the Day Room, correct?

22    A    Yes, that's correct.

23    Q    They all put it on the floor?

24    A    I believe so.

25    Q    They all put it in the area of the Day Room where

26    the screen had been pulled back.  That part of the Day

27    Room?

1       A     Within a proximity to that, yeah.

2       Q     Yes.  Okay, thank you.

3             You successfully defended Mr. Nemhard on all of

4    the charges except the rioting charge.

5       A     That's correct.

6       Q     And you were even successful in getting him

7    acquitted on an attempted escape charge.

8       A     That's correct.

9       Q     And I would ask you, you said you commenced

10   representation two months  --  you were appointed at least

11   two months after this incident.

12      A     A little more that two months, yeah.  When I

13   received a notice of appointment.  Yes.

14      Q     And you indicated that you wrote to Mr. Nemhard

15   when you were initially appointed.

16      A     In March.  That's how I know when I was appointed

17   because I have a letter, March of '93.  I wrote to him and

18   indicated who I was and that I had been appointed.

19      Q     Now, counsel for Mr. Nemhard has asked you the

20   question earlier, Did you discuss with Mr. Nemhard how he

21   lost the part of his finger, is that correct?

22      A     Yes, that's correct.

23      Q     And what did Mr. Nemhard indicate to you

24   regarding that?

25                  MR. GALLUCCI:  Your Honor, has the

26                  attorney/client privilege been formally waived in

27                  this matter?

1      THE COURT:  I don't know.

2      Counsel?

3      MS. HUTCHINSON:  It has not been formally

4   waived.

5      THE COURT:  Would you inquire of your

6   client please?

7      (Whereupon, an off-the-record discussion

8   was had.)

9      MS. HUTCHINSON:  Your Honor, he does waive

10  the attorney/client privilege.

11     THE COURT:  Thank you.  I just need one

12  moment please, before you continue.

13     MR. GALLUCCI:  Yes, Your Honor.

14     THE COURT:  Very well, thank you.  You may

15  continue.

16  **BY MS. HOWE:**

17     Q    You can answer the question, I take it.

18     THE COURT:  Yes.

19  **BY MS. HOWE:**

20     A    Yes, he did.  He actually sent me a letter dated

21  April 5, 1993.

22     Q    What was the account that you originally received

23  from Mr. Nemhard as to how he lost the tip of his finger?

24     A    He indicated that he was holding the screen in

25  the Day Room and that someone smashed the fire extinguisher

26  into his hand.

27     Q    Was there any particular reason why you did not

1    seek any type of further  --  explore any further

2    evidentiary matters concerning the screen in the Day Room?

3        A    Well, clearly based upon that disclosure, I felt

4    that any evidence that was retained, either of the screen

5    or fire extinguisher of the like, would be incriminating.

6        Q    That was based on your understanding of the

7    information you received from your client?

8        A    Yes.

9        Q    Now in terms of this particular case, would it be

10    fair to say that at the time Mr. Nemhard was  --  that all

11    of the parties agreed that at some point Mr. Nemhard was

12    back in his cell and that he was suffering from the injury

13    to his finger in his cell?

14        A    I think there was agreement in the testimony that

15    at some point he wound up back in his cell and that his

16    finger was injured, yes.

17        Q    So all of the parties agreed that at some point

18    Mr. Nemhard was in his cell and he was bleeding from his

19    cut finger in his cell?

20        A    Yes.

21        Q    And he was taken from his cell to get medical

22    attention?

23        A    That was reported in testimony, yeah.

24        Q    So the disagreement came about as to where he

25    injured his finger?

26        A    The disagreement between the State and Defense,

27    yes.

1       Q      Yes.  Okay.

2              And you questioned Detective McGuire, who is the

3       Connecticut State Police Detective  --

4       A      Yes.

5       Q      (Continuing)  --  who was assigned to investigate

6       this case for the state police?

7       A      Right, I recall that.  Yes.

8       Q      You brought out, in questioning him, that he did

9       not take photographs of the door jamb of Mr. Nemhard's

10      cell.

11      A      I believe it was established that no photographs

12      were taken.  I'm not a hundred percent sure it was through

13      McGuire, but I know that was asked and that was admitted.

14      Q      So that factor was brought out during the course

15      of trial?

16      A      Oh, yeah.

17      Q      And based on your discussions with your client,

18      as to what he had told you about the case, did you think it

19      was to your advantage to leave it at that?

20      A      Well, it's a difficult situation because  --  the

21      answer is yes.

22             It was a difficult situation for defense counsel

23      because there was basically two different versions that had

24      been presented at two different times and I felt it was  --

25      first of all, there was nothing I could have done about

26      taking any photographs two or three months later.  That

27      would have been pointless.  So I was stuck with the

1    evidence that we had.  But I was relatively glad that some

2    of that had not been preserved.

3        Q    It gave you the opportunity to at least argue

4    that perhaps your client's version could be found to be

5    credible?

6        A    Well, I did argue that.

7        Q    Okay.  And you were able to argue that in part

8    because there wasn't a photo taken?

9        A    Right.

10       Q    So in terms of having a photo taken, Mr. Nemhard

11   has indicated he wished that you had  --  he wished a photo

12   had been taken.

13            You're indicating you were not capable of taking

14   it because you weren't his counsel at the time of the

15   crime.  You weren't at the crime scene, correct?

16       A    Right.  I was not.

17       Q    But you were able to utilize, for purposes of

18   defense, the factor that the detective hadn't taken a

19   photograph of the particular location Mr. Nemhard testified

20   about.

21       A    Right.  That and the fact that there had been

22   some testimony that there was some blood there.

23       Q    Yes.  That was something you utilized as best you

24   could to your benefit.

25       A    Right.  That fit the theory of defense.

26       Q    Okay.  Oh, well that's what I'm leading up to.

27            The evidence could be utilized to facilitate the

1      theory of defense?

2          A    Yes.

3          Q    In terms of the photographs that were admitted in

4      our exhibits in the proceeding today, photographs

5      seventeen, eighteen, nineteen and twenty, those particular

6      photographs were taken basically on the eve of trial by

7      persons at the facility for purposes of explaining what the

8      cell doors look like  --

9          A    Yeah, I actually  --

10         Q    (Continuing)  --  and you objected at the trial,

11     did you not?

12         A    (Continuing)  --  My recollection is that I did.

13         Q    Okay.

14         A    (Continuing)  --  I haven't studied the

15     transcripts.  My recollection  --  it was seven years ago,

16     but my recollection is that I did.

17         Q    It was brought out in front of the jury that

18     these were not crime scene photos, these were just

19     illustrative photos.

20         A    Right.  That would have been made clear that

21     they were not of the crime scene or the date of the crime

22     scene.

23         Q    So that was a factor that was made known to the

24     jury at trial?

25         A    I believe it was, yeah.

26         Q    The admissibility of those exhibits was

27     ultimately up to the court, was it not?

1       A       Right.

2       Q       And you expressed your objections to the court
3       and they came in anyway.

4       A       Well, they were obviously admitted into evidence.

5       Q       Okay.   Thank you.

6               Now, Mr. Nemhard has indicated that he was not
7       aware of the nature of the, for one of a better phrase,
8       elements of the crime of rioting.

9               Do you know if he was aware of the nature of what
10      the State would have to prove, to prove rioting?

11      A       I believe he was aware of the elements.

12              I think the defendants, and Patrick in
13      particular, have a difficult time believing what little
14      amount of conduct can constitute rioting.  But it's  --  I
15      clearly tried to discuss with him, especially based on my
16      experience with the Smith case, that really not a lot of
17      conduct was necessary.  I think you can advise the
18      defendants of it, and you try to get them to understand it.
19      Now whether they fully understand it or not, I don't know.
20      But I do my best to see that they do understand it.

21      Q       On direct appeal, you raised the issue of
22      sufficiency of the evidence to prove rioting, correct?

23      A       Right.

24      Q       The Appellate Court issued a per curiam decision
25      denying the appeal.

26      A       Right.  It's a pretty tough  --  case law in the
27      statute is pretty tough in terms of what constitutes