Case 3:01-cv-01700-JCH   Document 24-6   Filed 11/21/2003   Page 1 of 19

78

1  rioting. It's not really what we think of in the
2  vernacular as rioting.
3     Q    In this particular case you knew there was
4  evidence  --  well I don't want to re-litigate the case,
5  but had you explained to Mr. Nemhard that you expected that
6  there would be evidence that he was out of his cell,
7  witnesses saw him out of his cell?
8          I believe there was testimony he was even seen in
9  the company and talking to the person who was operating the
10 control panel at the officer's control station. That he
11 was in the Day Room area. The evidence about where his
12 finger was located would be corroborative of that factor.
13         All of these factors in the context of what
14 happened that day would be elements  --  would constitute
15 evidence of elements of rioting.
16    A    I felt it was an extremely difficult case.
17         In addition to the conversations that we had
18 about the case, I did, at one point, even send him a letter
19 explaining to him what the maximum penalties were, the
20 mandatory minimums, and indicated to him that based on his
21 own version of the facts as he had presented them to me,
22 that I felt that he could be found guilty of a couple of
23 different charges. Including the rioting charge.
24    Q    Do you recognize this, sir?
25    A    Yes. That's a copy of the letter of December 8,
26 1993, that I'm talking about.
27    Q    And was that written to Mr. Nemhard explaining

```
 1   the State's offer and your assessment of it?
 2        A    Yes.
 3        (Whereupon, the document was marked as Exhibit D for
 4   identification.)
 5                 THE COURT:  Thank you.  State's Exhibit D.
 6                 And there is no objection?
 7                 MS. HUTCHINSON:  No objection, Your Honor.
 8                 THE COURT:  Very well, thank you.
 9   BY MS. HOWE:
10        Q    Attorney Gallucci, you show in your Defendant's
11   D, your Respondent's D, -- there's some handwriting on
12   the exhibit.  Well, it has your signature at the bottom.
13   That's his writing?
14        A    That's correct.
15                 THE COURT:  Counselor, I'm sorry, if I
16            could just interrupt for a moment.  Since it has
17            been made a full exhibit --
18                 MS. HOWE:  Show this to the Court?
19                 THE COURT:  (Continuing)  -- Yes, --
20                 MS. HOWE:  I'm sorry.
21                 THE COURT:  (Continuing)  -- and then I'll
22            be better able to understand.
23                 Thank you, Counsel.
24   BY MS. HOWE:
25        Q    Attorney Gallucci, the handwriting that is on the
26   exhibit, underneath the line that says, Total exposure
27   eighty years, there's a handwritten note --
```

```
 1      A    Correct.
 2      Q    (Continuing) -- I beat all these charges at
 3 trial.  Where did that handwritten part of the exhibit come
 4 from?
 5      A    Subsequent to the trial, Mr. Nemhard, in
 6 connection with a letter that he had sent to me, returned
 7 my original letter to me and he had written that across the
 8 front of the letter.
 9      Q    And in your letter you indicate, Based upon your
10 version of the facts, your conduct constitutes attempted
11 escape, conspiracy and rioting.
12           You indicate, At least one inmate witness,
13 believe at least one corrections officer, who have
14 identified you as a participant in the assault.  But you
15 say, Therefore, even based upon a possible conviction on
16 one charge, the five year offer must be seriously
17 considered.
18           And I would ask, why did you indicate that to
19 your client?
20      A    Well, it was a difficult case from the beginning.
21 Originally, at the first pretrial, Donald Brahm had
22 indicated to me that this was a twenty year consecutive
23 offer.  There would be no plea bargaining.
24           And subsequent to that, when another attorney was
25 assigned the case, the offer was reduced to five years
26 consecutive.
27           So what I was attempting to do here was  --  I
```

1   recognized that Patrick was intent on having a trial.
2   There were several defendants involved in various stages of
3   this. And I felt that I wanted to, outside of the pressure
4   of the cell block where the other inmates were pressuring
5   each other to do things, to try to summarize for him where
6   I thought we were at.
7          In the sentence about the assault was that, you
8   know, it was almost being treated as a given by the
9   defendant. That he was not going to be convicted of the
10  assault. Like we were already passed that somehow, and I
11  was trying to remind him that even at a trial it is  --
12  you know, we're not really out of the woods on that one
13  yet, either. And that's all I was trying to do. And I try
14  to do this with defendants so at least they have it in
15  writing and they have something to think about.
16     Q   And how about, in particular, the charge of
17  rioting?
18     A   Well, as I said, I had the experience before that
19  rioting is really the most difficult charge in this case,
20  because, even by our own version of what took place, I knew
21  from the Smith case that even being outside of  --  which I
22  also handled the appeal on  --  that even being outside of
23  the cell while this was going on, that his own version of
24  returning to the cell and getting his hand caught in the
25  door by itself, admits being out of the cell. And that, in
26  and of itself, I was afraid could constitute a riot
27  conviction.

1    Q    Under the circumstances that developed in terms
2    of the whole picture of this trial  --
3    A    Right.  That people were going to identify him as
4    being out of the cell.  And I know he had an explanation
5    for that, but I thought in and of itself that might be
6    enough.
7         People don't really grasp, and I tried to explain
8    by showing this letter that, that in and of itself is a
9    one-to-twenty statute.  It's a Class B Felony.
10   Q    I guess you can't be getting back into your cell
11   unless you're first out of your cell.
12   A    Well that was my fear of the testimony.
13   Q    And you referred to the Smith Case.  Was that a
14   prior case that you tried, that involved rioting as one of
15   the charges?
16   A    It was within a year or two before this, and the
17   appeal was decided before this, and it was State versus
18   Walter Smith.
19        It was a case where an inmate had been accused of
20   attempted murder of a corrections officer, and it was a big
21   lengthy trial in which the defendant was acquitted of all
22   charges but the rioting charge.  And the conduct that Smith
23   had participated in was far less serious, in terms of the
24   rioting, than I felt Patrick had.  And I was concerned
25   about that.
26   Q    So you had already  --  well, for the record
27   that's a case you and I tried, is that not correct?

1    A    Yes. Yeah, you were on that case.

2    Q    All right. But in terms of giving you an actual
3  factual basis, based on trial experience of the nature of a
4  rioting charge, the types of evidence that would come in,
5  that's something through personal experience that you were
6  familiar with as a trial attorney.

7    A    Right. Plus I already knew in advance how the
8  Appellate Court ruled on the Smith Case. So I was
9  painfully aware of how little conduct was really required
10 to justify, or would support a conviction on that charge.

11   Q    And in this particular case, you were aware going
12 into trial that there was evidence of Mr. Nemhard having
13 left his cell, been observed out of his cell during the
14 course of this incident, in which multiple parties were out
15 of their cells and a corrections officer was severely
16 injured, and there was an attempt to  --  there was a
17 screen pulled down and a window was attempted to be broken.
18       Those are all aspects of this incident.

19   A    Right. There were several allegations to deal
20 with. The rioting wasn't the number one thing on our mind,
21 but it was definitely there.

22   Q    That was something that you felt there was
23 evidence, even from the defense perspective, that would
24 support that charge.

25   A    Yes.

26   Q    You advised your client of that, is that correct?

27   A    We talked about it, and I did it in writing.

1     Q     Were you surprised that the jury found the
2  evidence sufficient to convict him of rioting?
3     A     No.
4     Q     Based on your testimony, it would sound also like
5  the original version that you heard from your client would
6  also have supported a conviction for attempted escape.
7     A     If that was the correct version, it would have.
8     Q     And you were successful in having him acquitted
9  on that charge, weren't you?
10    A     Yes, yes.
11    Q     In your opinion, if you had developed some of the
12  physical, or insisted that some physical evidence relating
13  to, let's say the screen,  --  well I asked you earlier
14  about forensics.  You felt that would of hurt your case.
15    A     It would have proved the State's case.
16    Q     Yeah, I think it would have.  Yes.
17          Okay, thank you.
18          So that would have exposed to the additional  --
19  to a worse result than you got?
20    A     I would be answering questions now about why I
21  did that.
22    Q     Pardon me?
23    A     I would be answering questions now about why did
24  I do that.
25    Q     Okay.  Thank you, sir.
26          Would you agree that sometimes good defense work
27  consists of not doing things as well as consisting of doing

1  things.  In other words, in knowing what not to pursue and
2  what you should pursue?
3      A    I think any time your defending a criminal case
4  you have a strategy and you have to make decisions.
5  Sometimes you know -- sometimes you have a long time to
6  think about things, sometimes you have a short time.
7           We had the benefit, this time, of a long time to
8  think about how we were going to approach that evidence.
9  And I do think that yes -- I mean, sometimes it's what
10 you don't say, or what you don't bring up, or what they
11 don't bring up, that's more important than what you do say.
12 Particularly when the State has a burden of proof.
13     Q    Do you think you benefited in the defense by
14 certain things that were not done by the State?
15     A    Absolutely.
16     Q    And was your client apprised of the nature of the
17 evidence that the State was expected to produce at trial?
18     A    We discussed the case, we exchanged some letters,
19 we talked about it.  We talked about it particularly the
20 day the trial was going to start too.  I mean, that was
21 another discussion there.  Everyone's talking about five
22 years, but the offer was actually reduced to a zero to six
23 cap on the day of the trial.  So that gave us an
24 opportunity to kind of roll over it again.
25           For example, there was an inmate who was expected
26 to testify that he saw Mr. Nemhard assaulting the
27 corrections officer, and that inmate didn't wind up

1    testifying.
2             So there were some things that we talked about
3    that didn't actually come to light and there were some
4    things that did.
5        Q    In terms of the decision whether to proceed to
6    trial, whose decision was that?
7        A    That was Mr. Nemhard's decision.  --
8        Q    All right.
9        A    (Continuing)  --  I tried to provide whatever
10   guidance I could, but ultimately that was his decision.
11       Q    Was he made aware of the information in the
12   State's disclosure to you?
13       A    It was sent to him on a couple of occasions.
14   Once, in a December 1993 letter.  I'm quite sure we
15   discussed it at some point but  --  and also, again, I sent
16   a certified letter enclosing the State's disclosure.  Which
17   doesn't contain everything that the State intends to
18   present, but whatever they had been required to disclose, I
19   did send him a copy of that.
20       Q    In terms of the nature of the State's case, was
21   that disclosed to him?
22       A    There were statements taken from inmates that had
23   both inculpatory and exculpatory elements to them.
24            The theory of the State's case we certainly
25   discussed on several occasions.  I vividly recall one where
26   almost all the codefendants were in the bull pen, and it
27   was not really a productive session.  But I recall not only

1    I, but several attorneys trying to explain what they think
2    was going to happen.
3        Q    In terms of the charge that your client was
4    convicted of, the rioting charge, based on your discussions
5    with Mr. Nemhard, and then the explanations of the facts
6    and law that you gave him, do you have an opinion as to
7    whether or not he was informed of the nature of the
8    charges, the nature of the evidence, and your professional
9    opinion as to the likely hood of an outcome?
10       A    I think he was informed. I think he was
11   informed.
12            I'm not sure  --  well, obviously as I'm sitting
13   here, I'm not sure based on all that, why he would proceed
14   to trial. But I think he was informed and I think he made
15   a decision. As I said, I think defendants are surprised,
16   they're not lawyers, that no matter how much you try to
17   explain it to them, I think they're surprised at how little
18   conduct is really required to constitute rioting. Because
19   I think they think rioting means participating in an actual
20   riot. And we try very hard to explain to them that it does
21   not.
22       Q    But it was explained to him?
23       A    Oh, I'm sure it was. Yes,  --
24       Q    And in terms of your  --
25       A    (Continuing)  --  more than once.
26       Q    (Continuing)  --  dealings with Mr. Nemhard, did
27   he appear to you to be at least of average intelligence?

1       A       Oh, yes.  Patrick is intelligent.

2       Q       In terms of how a trial works, was that explained
3    to him?

4       A       Yeah.  I think he had a pretty good understanding
5    of how the trial procedure worked.  And he did request, you
6    know, several inmates be brought in.  I remember some
7    lengthy discussions about how we were going to have to try
8    to get them in.  And we did get them in.  So I recall some
9    of that.

10      Q       Okay.  All right.  Thank you, sir.

11                      THE COURT:  Attorney Hutchinson?

12                      MS. HUTCHINSON:  Yes.

13   **REDIRECT BY ATTORNEY HUTCHINSON:**

14      Q       Attorney Gallucci, the jury ultimately acquitted
15   Mr. Nemhard of trying to escape through the window, is that
16   correct?

17      A       That's correct.

18      Q       And they didn't believe the evidence that he cut
19   his finger on that screen, is that correct?

20                      MS. HOWE:  I would object to that, Your
21              Honor.  The two are not synonymous.

22                      THE COURT:  Okay.  Once again, Counsel, the
23              jury didn't convict him of attempted escape.

24                      MS. HUTCHINSON:  They didn't believe -

25                      THE COURT:  Right.

26                      MS. HUTCHINSON:  (Continuing)  --  that he
27              cut his finger on that screen.

1           MS. HOWE:  That does not necessarily follow
2      from the attempted escape.
3           MS. HUTCHINSON:  I'll withdraw it, Your
4      Honor.
5           THE COURT:  Very well.
6  **BY MS. HUTCHINSON:**
7      Q    The jury did acquit him of that charge, is that
8  correct?
9      A    Yes.
10     Q    You said that there was nothing you could have
11 done about taking photos of the door with blood on it, but
12 you could have requested that photographs be taken of the
13 door of his cell showing the sharp edge.  Isn't that
14 correct?
15     A    Assuming there was a sharp edge, I could of maybe
16 made a motion to have it photographed.
17          When you're dealing with the interior of a
18 Department of Corrections facility, you can't just walk in
19 and photograph it.  You have to sort of request that
20 somebody else do it.  And I could have done that.
21     Q    But you didn't.
22     A    No, I didn't.
23     Q    The State did bring in photographs, but of a
24 different door.  Is that correct?
25     A    You know, my recollection as to the cell location
26 of that door, as to what went on in trial  --  you'll have
27 to refer to the transcript because I just don't remember

```
 1    the numbers.  I don't.  You know, I have no reason to
 2    dispute that, that could be true.  I just don't have any
 3    recollection of it.
 4         Q    Attorney Howe asked you about the appeal, that
 5    you raised the issue of sufficiency of evidence on appeal,
 6    but you didn't raise the issue of the Court admitting those
 7    photographs that were not represented to the  --
 8         A    Right.
 9         Q    (Continuing)  -- crime scene.
10         A    (Continuing)  --  Right.  That's true.
11              MS. HUTCHINSON:  I have nothing further,
12         Your Honor.
13              THE COURT:  Very well.
14              Counsel?
15              MS. HOWE:  I have nothing further, thank
16         you.
17              THE COURT:  Very well.
18              Counsel, you may step down.
19              MR. GALLUCCI:  Thank you, Your Honor.
20              THE COURT:  You're welcome.
21              (Whereupon, the witness steps down.)
22              MS. HUTCHINSON:  Your Honor, I have one
23         further witness.
24              THE COURT:  Very well.
25              MS. HUTCHINSON:  Detective McGuire.
26              (Whereupon, the witness takes the stand.)
27              THE CLERK:  Please raise your right hand
```

```
 1              sir.
 2                      Do you solemnly swear that the evidence you
 3              shall give concerning the case now in question
 4              shall be the truth, the whole truth, and nothing
 5              but the truth, so help you God?
 6                      MR. MCGUIRE:  Yes, I do.
 7                      THE CLERK:  Please state your name.
 8                      MR. MCGUIRE:  Sergeant John McGuire.
 9                      THE CLERK:  Spell your last name.
10                      MR. MCGUIRE:  M-c-G-u-i-r-e.
11                      THE CLERK:  And your business address?
12                      MR. MCGUIRE:  Eleven, Eleven, Country Club
13              Road in Middletown, Connecticut.
14                      THE CLERK:  Please be seated.
15                      MR. MCGUIRE:  Thank you.
16                      THE COURT:  Good afternoon, sir.
17                      MR. MCGUIRE:  Good afternoon, Your Honor.
18      DIRECT EXAMINATION BY ATTORNEY HUTCHINSON:
19         Q    Good afternoon, Sergeant.
20         A    Good afternoon, Ma'am.
21         Q    In 1993, by whom were you employed?
22         A    By the State of Connecticut.  Connecticut State
23      Police.
24         Q    In what capacity.
25         A    I was a trooper at that time, assigned to the
26      western district major crime squad.
27         Q    And on January 16, 1993, were you called to
```

1   investigate an incident that took place at the Bridgeport

2   Correctional Center on North Avenue in Bridgeport?

3       A   Yes, I was.

4       Q   On that afternoon did you go to cell block A-ten

5   at Bridgeport Correctional Institute?

6       A   I believe so, yeah. The thirty-nine block, I

7   believe, is where the incident occurred.

8       Q   Did you conduct an investigation of the incident

9   that took place that date?

10      A   Yes, I did.

11      Q   Did you in fact take some photographs that day?

12      A   Yes.

13      Q   And during the course of your investigation, were

14  you advised that there was blood on the door of the cell A-

15  ten dash eleven?

16      A   I don't recall the specific cell. If you're

17  referring to your client's cell, yes, I was informed that

18  there was blood on the door.

19      Q   Did you take any photographs of that blood?

20      A   No, I did not.

21      Q   Did you take any samples of that blood?

22      A   No, I did not.

23      Q   Do you have any special training in gathering

24  evidence from a crime scene?

25      A   Yes, I do.

26      Q   Does that training include how to remove blood

27  for saving for testing?

1   A   Yes.

2   Q   Did you have equipment with you available to
3   remove those blood samples?

4   A   Not with me. I probably could have obtained it,
5   yes.

6   Q   Did you try to obtain it?

7   A   No.

8   Q   Did you take samples of any of the blood found
9   anywhere in that crime scene?

10  A   I don't believe so, no.

11  Q   Did you have the capacity to do any type of
12  testing on the blood without taking it from the crime
13  scene?

14  A   I don't recall if there were any traces of blood
15  on the exhibits that we ceased, with obviously the
16  exception of a serology test on the tip of the finger. But
17  other than that, no, I don't believe so.

18  Q   Is there any specific reason why you didn't take
19  photographs of the blood on the door?

20  A   The detective I was with, and I, both examined
21  the door. But it's my recollection that we saw the blood
22  on only the jamb portion of the door. That evening we were
23  made aware, by corrections officers, of the claim that Mr.
24  Nemhard was making. That his finger was severed in the
25  door.

26      I discussed it with Detective Follup back and
27  forth. In examining the door, we felt that having already

```
 1    observed the finger, that we observed blood, I believe,
 2    only on the jamb portion of the door.  And we felt that if
 3    that had occurred there would be corresponding blood on the
 4    leading edge of the door that closes.  And we did not
 5    observe any there.
 6         Q    But in the absence of photographs taken by the
 7    investigating team, there was no way that the defendant,
 8    Mr. Nemhard, could have shown that there was blood on both
 9    sides, is that correct?
10         A    Yes.
11         Q    Was there anybody else there, other than State
12    Police and Department of Corrections Officers, who could
13    have taken photographs at the scene?
14         A    Not that I'm aware of.
15         Q    So if you didn't take photographs of the
16    evidence, there's no way that the defendant could have
17    gotten those.  Is that correct?
18         A    I'm not sure I understand the question, Counsel.
19         Q    In other words, if he wanted photographs of that
20    scene, if his claim was that there was more blood and he
21    wanted photographs, he could not have taken photographs.
22    Is that correct?
23         A    That's correct.
24         Q    Only the Department of Corrections or the
25    Connecticut State Police who were there investigating.  Is
26    that correct?
27         A    Yes.
```

```
 1        Q    And how long after the incident occurred did you
 2   arrive on the scene?
 3        A    I don't recall a specific time of the incident.
 4   I remember I arrived at approximately six o'clock, six a.m.
 5        Q    Was the scene secured when you arrived?
 6        A    Yes, I believe it was.
 7        Q    Was there anybody guarding the area?
 8        A    I don't specifically recall if there was or not.
 9        Q    Was there any type of tape up, to prevent anybody
10   from walking through?
11        A    I don't recall.
12        Q    Do you recall if anything had been moved or
13   changed from the time of the incident until you arrived?
14             Do you recall having been advised of that?
15        A    I was advised that the  --  I believe the fire
16   extinguishers in question had been removed from the Day
17   Room to the Captain's office.  I believe that's where we
18   ceased them from.
19        Q    Did you make any inquiry as to how many people
20   had been through the area from the time of the incident
21   until the time you arrived?
22        A    No, I did not.
23                  MS. HUTCHINSON:  I have nothing further.
24                  THE COURT:  Very well.
25                  Attorney Howe?
26   CROSS EXAMINATION BY ATTORNEY HOWE:
27        Q    Is it Sergeant McGuire now?
```

```
1       A    Yes.

2       Q    At the time in question, you were a detective?

3       A    I think I was still a trooper.

4       Q    Trooper?  I'm sorry, because I've been referring
5   to you as the  --  you were the person who investigated it
6   --

7       A    Yes.

8       Q    (Continuing)  --  in a detective capacity for the
9   Connecticut State Police?

10      A    That's correct.

11      Q    You testified just now that you examined the door
12  and the door jamb to Mr. Nemhard's cell, and you found
13  blood on only one half  --

14      A    Right.

15      Q    (Continuing)  --  and not the other half.

16      A    Right.  In addition  --

17      Q    Pardon me.

18      A    (Continuing)  --  in addition to that, finding
19  only blood on one, Detective Follup and I came to the
20  conclusion that what had probably happened was as he was
21  going back into the cell, his hand was placed on the door.

22           We examined, as I said, the leading edge of the
23  door.  There was no blood there and it was in fact rounded.
24  Had I known that was going to be part of the defense, in
25  hind sight would I have taken a photo?  Absolutely.

26      Q    Well, that's leading up to what I'm  --
27  basically, having learned now  --  I'm sorry.  Having
```