1   learned during the course of the presentation of the case,
2   or having heard the proceedings today, you learned that the
3   defense was that the cell door was sharp, and the claim was
4   that Mr. Nemhard somehow had part of his finger severed
5   from the door slamming on his finger.  That if you'd known
6   that in more detail, you would have taken the photos to
7   corroborate your own observations.
8       A   Yes.
9       Q   In other words, from your observations at the
10  scene, what you saw did not corroborate Mr. Nemhard's
11  version, it corroborated that blood was just deposited on
12  one part  --
13      A   Yes.
14      Q   (Continuing)  --  probably as someone was
15  reentering a cell.
16      A   Yes.
17      Q   So in terms of your personal observation of the
18  door, and the door jamb, would it be fair to say that when
19  the door closes, part of the door goes into a jamb and the
20  two  --
21      A   Yes.
22      Q   (Continuing)  --  are in proximity to each other?
23      A   Yes.
24      Q   So if someone was bleeding as a result of the
25  door and the door jamb coming together, you would have
26  blood on both halves.  On the door and on the door jamb?
27      A   It's been my experience that there's a transfer

```
 1   theory.  There should be transfer on both items that come
 2   into contact.
 3        Q    Yes.  If that's the nature of the claim --
 4        A    The jamb and --
 5        Q    (Continuing) -- that the finger is severed
 6        A    Yes.
 7        Q    (Continuing) -- as a result of being caught
 8   between the two, you'd get blood on both halves?
 9        A    Correct.
10        Q    Or both parts.
11        A    Right.
12        Q    They're not halves.  The door and the jamb.
13        A    Yes.
14        Q    And you observed the door, you observed the jamb,
15   and there was blood on one and not the other?
16        A    Yes.
17        Q    And the finger was not in the cell?
18        A    No, it wasn't.
19        Q    It was in the Day Room, was it not?
20        A    Yes, it was.
21        Q    So based on your observations, was there anything
22   about what you observed to support a theory that the finger
23   was crushed or severed in the door way?
24        A    No, not to support that theory.  No.
25        Q    In fact, what you observed was to the contrary.
26        A    Yes.  And also in addition to what I observed
27   there, the information that I was receiving from
```

1   correctional officers, as from other inmates as the
2   investigation progressed, lead me to not believe the theory
3   or the inmate's claim that his door had been severed in the
4   finger -- pass -- retract that -- his finger had been
5   severed in the door.
6       Q   All right, thank you, sir.
7       A   You're welcome.

**REDIRECT BY ATTORNEY HUTCHINSON:**

9       Q   Sergeant, is your testimony that there was no
10  other blood around, just on the door jamb around the cell?
11      A   I don't recall if there was on the floor or not.
12  I specifically remember looking at the jamb where there was
13  traces of blood in the corresponding section at that height
14  of the door itself.
15      Q   And it's your belief that Mr. Nemhard left the
16  blood there by putting his hand on the door as he went in?
17  Is that correct?
18      A   That was my feeling at the time.
19      Q   But wouldn't it also then be correct that if
20  other people came in and out of the door and held the other
21  side of it as they were taking inmates in or out, that they
22  could have wiped off whatever blood had been there?
23              MS. HOWE:  I think we're getting
24          theoretical now, at this point.
25              MS. HUTCHINSON:  Your Honor, I claim that
26          she went into his theory.  What his theory was,
27          was to why there wasn't blood on the other side.

1              THE COURT:  I'll allow it.  I'll allow it.
2    **BY MS. HUTCHINSON:**
3         A    Could you repeat the question Counsel, I'm sorry.
4         Q    Isn't it possible that as other people went in or
5    out of that cell, either to put other inmates in or to take
6    Mr. Nemhard out, that they touched the side of the door
7    with no blood, thereby wiping off whatever blood might have
8    been there?
9              That's possible, isn't it?
10        A    It's possible that somebody might have touched
11   that side of the door, yes.
12             To remove all the blood, my opinion would be
13   unlikely.  I know you didn't ask for my opinion but,
14   unlikely.
15        Q    But that could have happened?
16        A    Yes.
17             MS. HUTCHINSON:  I have nothing further,
18   Your Honor.
19             THE COURT:  Very well.
20             Counsel, anything based on that?
21   **RECROSS BY ATTORNEY HOWE:**
22        Q    Well the bottom line is that you didn't take
23   photographs to support what you've now learned is Mr.
24   Nemhard's theory of defense.
25        A    Yes.
26        Q    And you saw no evidence when you were on the
27   scene to support that theory.

1    A    No, I didn't.

2    Q    Okay, thank you.

3         THE COURT:  Very well.

4         Attorney Hutchinson?

5  **FURTHER REDIRECT EXAMINATION BY ATTORNEY HUTCHINSON:**

6    Q    Sergeant, you knew that theory on the day you

7  were doing the investigation.

8    A    Yes, I did.

9    Q    You knew, that on that day, he claimed his finger

10 was severed in the door?

11   A    Yes.

12   Q    Okay, thank you.

13        THE COURT:  Very well.

14 **FURTHER CROSS EXAMINATION BY ATTORNEY HOWE:**

15   Q    Did you see  --  well I guess we already covered

16 this, but in terms of anything you saw that would

17 corroborate that, did you see anything that  --

18   A    No.

19   Q    Okay.  Thank you.

20        All right.  That's my point.

21        MS. HUTCHINSON:  I have nothing further.

22        THE COURT:  Very well.

23        MS. HUTCHINSON:  The Petitioner rests.

24 **BY MS. HOWE:**

25   Q    Thank you, Sergeant.

26        THE COURT:  You may step down, sir.

27        MR. MCGUIRE:  Thank you, Your Honor.

1    THE COURT:  Thank you.
2    Did the State plan on presenting witnesses?
3    MS. HOWE:  No, Your Honor.  I think I've
4    introduced the exhibits I think are relevant, and
5    expressed my views through cross examination.
6    THE COURT:  Very well.
7    It is close to five.  If you'd like to make
8    any arguments at this time, I will be requiring
9    that the briefs be filed, and setting a date for
10   the filing of briefs.
11   Do the parties wish to address the Court at
12   this time?
13   MS. HUTCHINSON:  No, Your Honor.  I'll put
14   my argument in the brief.
15   THE COURT:  Very well.
16   That's agreeable with you, Counsel?
17   MS. HOWE:  Yes.  I would request if, as far
18   as scheduling of briefs, if Attorney Hutchinson
19   could file a brief and then I could file a reply
20   brief.  It's easier to clarify the issues if I
21   understand what she's claiming, and then I can
22   respond to them.  And if she needs to respond
23   further to my brief  --  I think it's a more
24   orderly process because then we both are on the
25   same page as to what the claims are.
26   THE COURT:  Very well.
27   Any objection, Counsel?

```
 1              MS. HUTCHINSON:  No, Your Honor.
 2         If I could have six weeks.
 3              THE COURT:  Oh, Counsel.
 4              MS. HOWE:  Are we going to have transcript
 5    ordered?
 6              MS. HUTCHINSON:  No.  No, I'm not.
 7              MS. HOWE:  Oh, okay.
 8              THE COURT:  I can't go that far out.  It
 9    wouldn't be fair to any of the participants
10    either, to go that far out before a hearing or
11    before a decision could be started.
12              MS. HUTCHINSON:  Your Honor, Mr. Nemhard is
13    serving a prior thirty year sentence on a felony
14    murder case.
15              THE COURT:  Right.
16              MS. HUTCHINSON:  He's not going anywhere.
17              THE COURT:  No, I understand that.
18         But everyone deserves to have a decision
19    rendered in a timely fashion.  I deserve to be
20    able to get these decisions started and finished
21    within a timely fashion.
22         And when I talk about fair, I mean fairness
23    in terms of  --  despite my extensive note
24    taking, my memory is dull.  So as with anyone,
25    the sooner we address this the better.
26         I would suggest three weeks for the initial
27    filing and then  --  Counsel how much time would
```

```
 1    you need after that?  Certainly not as much time.
 2            MS. HOWE:  No, probably a couple of weeks
 3    will be fine.
 4            THE COURT:  Very well.
 5            MS. HUTCHINSON:  May first?
 6            THE COURT:  May first, for filing of
 7    Petitionor's brief.  May fifteenth, for the
 8    filing of the State's brief.
 9            Okay, is there anything further at this
10    time?
11            THE CLERK:  Your Honor, just one thing.  On
12    the brief of the Exhibit B from the State, it's
13    the brief of the appellate, it isn't complete.  A
14    few pages are missing.  We need to get a full
15    Exhibit B.
16            MS. HOWE:  Which pages are missing, sir?
17            THE CLERK:  It looks like it just goes up
18    to page fourteen.  Then it just stops at page
19    fourteen.
20            MS. HOWE:  I have an additional copy.  It's
21    not as clear.  I'll show counsel.
22            MS. HUTCHINSON:  I could make a copy back
23    in my office.  I have pages fifteen through
24    twenty-two.
25            MS. HOWE:  There's twenty-two pages, and
26    then twenty-three is the completion and
27    certification.
```

```
 1              THE CLERK:  Exhibit B, Your Honor, is now
 2   --  it's unsigned, but   --
 3              MS. HOWE:  I think the original
 4         (inaudible) the fourteen pages is a clearer
 5   print and --  let me just check with Attorney
 6   Hutchinson.
 7              MS. HUTCHINSON:  Your Honor, I could copy
 8   pages fifteen through twenty-two and bring them
 9   to the Court tomorrow.
10              THE COURT:  Very well.  If you would do
11   that.
12              MS. HUTCHINSON:  Okay.
13              MS. HOWE:  That will be fine.  I apologize
14   to the Court for the quality of   --
15              THE COURT:  Okay, that concludes this
16   hearing.  Thank you for your presentations.
17              (Whereupon, court was adjourned.)
18
19
20
21
22
23
24
25
26
27
```

DOCKET NO. CR00003322091S

* * * * * * * * * * * * * *X

    PATRICK NEMHARD    :  SUPERIOR COURT OF CONNECTICUT

        -VS-          :  JUDICIAL DISTRICT OF DANBURY

       WARDEN       :  APRIL 10, 2000

* * * * * * * * * * * * * *X


## C E R T I F I C A T I O N

This is to certify that I, Anne Marie Zschoche, a Court Monitor in and for the State of Connecticut, certifies the foregoing is a true and accurate transcript of the court monitored tape taken with reference to the above-entitled matter, heard before the Honorable Robert T. Resha, Judge, at the Danbury Superior Court, Danbury, Connecticut, on April 10, 2000.

Dated at Danbury, Connecticut, on this 8th day of October 2003.

                                            Anne Marie Zschoche
                                              Court Monitor